IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Rick Lee Ray, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CIV 05-2718 PHX EHC (VAM) |
| | ) | |
| Lane Blair, et al., | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Respondents. | ) | |

TO THE HONORABLE EARL H. CARROLL, U.S. DISTRICT JUDGE.

Rick Lee Ray ("petitioner") filed a pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Petitioner raises 11 grounds for relief in the petition.  (Doc. 1 at pp. 5-15 and Attachments).  Respondents filed an answer opposing the granting of habeas relief.  (Doc. 11).  Petitioner filed a reply to the answer.  (Doc. 17).

## BACKGROUND

Petitioner was convicted of second degree murder in July, 1998, and was sentenced to 16 years in prison.  (Doc. 1 at p. 1; Doc. 11, Exhibit KK at pp. 1, 7).  Petitioner appealed raising the following claims:

**A.** THE TRIAL COURT COMMITTED CLEAR AND MANIFEST ERROR WHEN IT ALLOWED THE JURY TO HEAR APPELLANT'S INHERENTLY UNRELIABLE STATEMENTS.

**B.** THE TRIAL COURT COMMITTED CLEAR AND MANIFEST ERROR WHEN IT VIOLATED APPELLANT'S CONSTITUTIONAL PROTECTIONS

AGAINST SELF-INCRIMINATION.

**C.** THE TRIAL COURT COMMITTED CLEAR AND MANIFEST ERROR WHEN IT VIOLATED APPELLANT'S CONSTITUTIONAL PROTECTIONS AGAINST SELF-INCRIMINATION.

**D.** THE TRIAL COURT COMMITTED CLEAR AND MANIFEST ERROR WHEN IT VIOLATED APPELLANT'S CONSTITUTIONAL PROTECTIONS AGAINST SELF-INCRIMINATION.

**E.** THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED MS. KRABBE TO GIVE THE JURY THE NOTES FOR HER CLOSING ARGUMENT.

**F.** THE TRIAL COURT'S DENIAL OF APPELLANT'S REQUEST FOR RULE 404(a)(2) EVIDENCE VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL AND HIS RIGHT TO CONFRONTATION.

**G.** THE TRIAL COURT'S DENIAL OF APPELLANT'S REQUEST FOR RULE 404(a)(2) EVIDENCE VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL AND HIS RIGHT TO CONFRONTATION.

(Doc. 11, Exhibit HH at pp. 2-3).

In a memorandum decision filed on June 24, 2000, the Arizona Court of Appeals affirmed petitioner's conviction and sentence. (Doc. 11, Exhibit KK at p. 24).

On November 21, 2000, after receiving continuances, petitioner filed a timely petition for post-conviction relief pursuant to Ariz.R.Crim.P. 32.1 in the trial court.  (Doc. 11 at Exhibit MM).  Petitioner raised the following claims:

**A. Trial Counsel was Ineffective in Violation of Sixth Amendment Within the Meaning of Strickland.**

**1. Trial Counsel was Ineffective for Failing to Consult and Call a Pathologist, Ballistics Expert and Crime Scene Reconstructionist.**

**2. Trial Counsel was Ineffective for Failing to Adequately Advise Petitioner Regarding the Risks Associated with Going to Trial Relative to Accepting the Plea**

**3. Trial Counsel was Ineffective for Failing to Object to Repeated Prosecutorial Misconduct During Trial, Limiting the Appellate Court's Review to a Fundamental**

**Error Analysis.**

**B. Appellate Counsel was Clearly Rendered Ineffective Within the Meaning of Strickland because the Transcript of the Voluntariness Hearing was (and Still is) Unavailable, so that Appellate Counsel was Unable to Fully Support the Voluntariness Claim on Direct Appeal**

The trial court denied the petition in an order filed on November 27, 2003. (Doc. 11 at Exhibit RR). Petitioner filed for review in the Arizona Court of Appeals raising the following claims:

**A.** Was trial counsel ineffective within the meaning of the Sixth Amendment for failing to consult and call a pathologist, ballistics expert and crime scene reconstructionist?

**B.** Was trial counsel ineffective within the meaning of the Sixth Amendment for failing to adequately advise Petitioner of the risks associated with going to trial relative to accepting the plea offer?

**C.** Was trial counsel ineffective within the meaning of the Sixth Amendment for failing to object to repeated instances of prosecutorial misconduct occurring throughout his trial, limiting this Court's review on direct appeal to a fundamental error analysis?

**D.** Was appellate counsel rendered ineffective within the meaning of the Sixth Amendment because the transcript of the voluntariness hearing was (and still is) unavailable, making counsel unable to support the voluntariness claim?

**E.** Did the trial court abuse its discretion by denying Petitioner's request for leave to present the additional information in support of Petitioner's claims?

(Doc. 11, Exhibit SS at p. 2).

The Arizona Court of Appeals denied relief without comment on June 2, 2005. (_Id._ at Exhibit TT). On September 6, 2005, petitioner filed a federal habeas petition raising the following grounds for relief:

**GROUND I:** In violation of the 6th Amendment of the United

3

States Constitution.

[Defense] counsel's performance prior to and during trial from opening statement through closing argument was deficient, in that it fell below the standard competency for criminal attorneys in Az ....

**GROUND II:** In violation of petitioner's 6th Amendment Right of the United States Constitution.

Trial counsel's performance prior to and during the trial from opening statement through closing argument was deficient in that it fell below the standard competency for criminal attorneys in Arizona, ...

**GROUND III:** In violation of petitioner's 6th Amendment of the United States Constitution.

If defense counsel had retained the service of a Forensic Pathologist to review the records .... Trial counsel would [have] also been provided with crucial facts ... to properly refute the state's false evidence ....

**GROUND IV:** In violation of Petitioner's 6th Amendment of the United States Constitution.

Trial Counsel was ineffective within the meaning of the sixth amendment for failing to adequately advise petitioner of the risk associated with going to trial relative to accepting the plea offer ....

**GROUND V:** In violation of 5th and 6th Amendment of the United States Constitution.

... The lower court abused it's discretion in denying petitioner's request for leave to submit additional information and material in support of his petition that would be used to impeach medical examiner Dr. Keen's trial testimony that [the victim] was shot 4 or 5 times, and to show that the trial testimony was inconsistent with his original autopsy of [the victim] only being shot 2 times ....

**GROUND VI:** In violation of petitioner's 5th, 6th and 14th Amendment of the United States Constitution.

The lower court committed reversible [error] for not granting petitioner a new trial on the grounds that trial counsel was ineffective for failing to object to repeated instances of prosecutorial misconduct occurring throughout his trial, limiting Arizona Appeals court's review on direct appeal to a fundamental error analysis

....

**GROUND VII:** In violation of petitioner's 6th and 14th Amendment of the United States Constitution.

The lower court committed reversible [error] in denying Petitioner's claim that appellate counsel was rendered ineffective by not being able to support the voluntariness claim on direct appeal with transcripts of the voluntariness hearing, violating the 6th Amendment ....

The police also violated petitioners Constitutional Protection against self-incrimination ...

**GROUND VIII:** In violation of Petitioner's 5th and 14th Amendment of the United States Constitution.

Trial Court violation Petitioner's ... due process rights when it refused to allow petitioner to show that Wendy Danley had a prior history of violence and suicide, and however, allowed the State to present evidence that Danley was nonviolent and not physically violent towards others ....

**GROUND IX:** In violation of Petitioner's 6th and 14th Amendment of the United States Constitution.

    Prosecution knowingly presented false evidence in a 404(b) hearing to the tribunial [sic] in order to over come hearsay issues with Derek Hicks and Vance Matthews. Resulting in unreliable hearsay being admitted by the court at petitioner's trial.  Due to defense counsel's failure to object and refute prosecutions false misleading evidence ....

**GROUND X:** In violation of Petitioner's 6th and 14th Amendment of the United States Constitution.

Prosecution knowingly presented false information to the tribunal in a 404(b) hearing by presenting false evidence through Allan Johnson, which prosecution knew to be false. [W]hich violated petitioner's due process [rights] to a fair trial, as the judge admitted this false information to be used against petitioner at trial, due to being misled by prosecution with this false information ....

**GROUND XI:** In violation of petitioner's 6th and 14th Amendment of the United States Constitution.

 Petitioner's sentencing mitigation hearing was unconstitutional, due to the trial Judge himself

considering the minimum sentence up to the maximum
sentence in my case because the State was requesting for
a[n] aggravated sentence in this case.  Petitioner
contends his sentence was fundamentally unfair as the
judge should have only been deciding the sentencing
range ranging from the minimum sentence to the
presumptive 10 years to 16 years.  However the judge
improperly considered the range form [sic] the minimum
sentence to the maximum sentence, which ranges from a
minimum sentence of 10 years, presumptive sentence of 16
years and a maximum sentence of 22 years.  Petitioner
was sentenced to the presumptive term at sentencing.
The judge decided the case right down the middle of the
Minimum sentence petitioner was requesting for and the
maximum sentence prosecution was requesting for.
Petitioner, however, contends this sentencing range was
improper due to the Higher courts recent ruling in
<u>Blakely v. Washington</u>, where the most a judge can
sentence petitioner to without a jury first finding
aggravating circumstances, is the presumptive sentence
....

(Doc. 1 at pp. 5-15 and Attachments).

**<u>DISCUSSION</u>**

As a threshold matter, respondents contend that all of

petitioner's claims are procedurally barred because he failed to

present them to the Arizona Supreme Court.  Respondents contend

that Grounds V, VI, VIII, IX, X and XI are procedurally barred on

other grounds as well.

**I. Anti-Terrorism and Effective Death Penalty Act of 1996**

Pursuant to 28 U.S.C. § 2254(d), the following standard for

granting a federal habeas petition originating from a state court

conviction applies:

An application for a writ of habeas corpus on behalf of
a person in custody pursuant to the judgment of a State
court shall not be granted with respect to any claim
that was adjudicated on the merits in State court
proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme

Court of the United States; or

(2) resulted in a decision that was based on an unreasonable interpretation of the facts in light of the evidence presented in the State court proceedings.

The Act also codifies a presumption of correctness of state court findings of fact. 28 U.S.C. § 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner has the burden of proof to rebut the presumption by "clear and convincing evidence." As discussed more fully below, these provisions of the Act set the standard for the Court's evaluation of the merits.

The Act limits the district court's discretion to hold evidentiary hearings. 28 U.S.C. § 2254(e)(2) states:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A petition may be denied on the merits even though it contains unexhausted claims, and the state does not waive exhaustion except by an express waiver on the record. 28 U.S.C. §2254(b)(2) and (3).

7

**II. Exhaustion and Procedural Default**

   **A. Law Generally**

   A federal court has authority to review a federal constitutional claim presented by a state prisoner if available state remedies have been exhausted.  Duckworth v. Serrano, 454 U.S. 1, 3 (1981)(per curiam); McQueary v. Blodgett, 924 F.2d 829, 833 (9th Cir. 1991).  The exhaustion doctrine, first developed in case law and codified at 28 U.S.C. § 2254, now states:

   (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

   (A) the applicant has exhausted the remedies available in the courts of the State; or

   (B)(i) there is an absence of available state corrective process; or

   (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

. . . . . . .

   (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

   The exhaustion requirement can be satisfied in one of two ways.  First, a petitioner can fairly present his or her claims to the Arizona Court of Appeals by properly pursuing them through either the state's direct appeal process or through appropriate post-conviction relief.  See Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999).  Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court.  This is true even where alternative avenues of reviewing

8

constitutional issues are still available in state court.  <u>Brown</u>
<u>v. Easter</u>, 68 F.3d 1209, 1211 (9th Cir. 1995); <u>Turner v. Compoy</u>,
827 F.2d 526, 528 (9th Cir. 1987), cert. denied, 489 U.S. 1059
(1989).

    Claims presented in habeas petitions are considered exhausted
if they have been ruled upon by the Arizona Court of Appeals.
However, if the sentence received is life imprisonment, the claims
must be presented to the Arizona Supreme Court.  <u>Swoopes</u>, 196 F.3d
at 1010.   Although a federal habeas petitioner may reformulate
somewhat the claims made in state court, <u>Tamapua v. Shimoda</u>, 796
F.2d 261, 262 (9th Cir. 1986), <u>rev'd in part on other grounds by</u>
<u>Duncan v. Henry</u>, 513 U.S. 364 1995), the substance of the federal
claim must have been "fairly presented" in state court.  <u>Anderson</u>
<u>v. Harless</u>, 459 U.S. 4, 6 (1982)(per curiam); <u>Picard v. Connor</u>,
404 U.S. 270, 278 (1971).  While the petitioner need not recite
"book and verse on the federal constitution," <u>Picard</u>, 404 U.S. at
277-78 (quoting <u>Daugherty v. Gladden</u>, 257 F.2d 750, 758 (9th Cir.
1958)), it is not enough that all the facts necessary to support
the federal claim were before the state courts or that a "somewhat
similar state law claim was made."  <u>Anderson</u>, 459 U.S. at 6.

    As an alternative to presenting his claims to the highest
state court, a petitioner can satisfy the exhaustion requirement
by demonstrating that no state remedies remained available at the
time the federal habeas petition was filed.  <u>Engle v. Isaac</u>, 456
U.S. 107, 125 (n. 28)(1982); <u>White v. Lewis</u>, 874 F.2d 599, 602
(9th Cir. 1989).  However, this path is fraught with danger:

    If state remedies are not available because the

petitioner failed to comply with state procedures and thereby prevented the highest state court from reaching the merits of his claim, then a federal court may refuse to reach the merits of that claim as a matter of comity.

Buffalo v. Sunn, 854 F.2d 1158, 1163 (9th Cir. 1988); see also Swoopes, 196 F.3d at 1010 (determining that the exhaustion requirement is satisfied if a petitioner presented a claim to the Arizona Court of Appeals either on direct review or via a petition for post-conviction relief). This failure to comply with reasonable state procedures is usually characterized as "procedural default," "procedural bar," or a "waiver." As discussed, exhausting state remedies by means of a procedural default is risky. The burden is on the petitioner to show that he or she has properly exhausted each claim. Dismissal of the petition is proper when the record does not show that the exhaustion requirement is met. Cartwright v. Cupp, 650 F.2d 1103, 1104 (9th Cir. 1981)(per curiam), cert. denied, 455 U.S. 1023 (1982). If the unavailability of state remedies is in no way the fault of the petitioner or his or her counsel, the exhaustion requirement will likely be satisfied and a federal court may reach the merits of the petitioner's habeas claims.

In many cases, however, the lack of available state remedies is a direct result of the petitioner's failure to avail himself of the state remedies in a timely or procedurally correct manner. In such instances, the petitioner has procedurally defaulted, and may not obtain federal habeas review of that claim absent a showing of

"cause and prejudice" sufficient to excuse the default.[1]  Reed v. Ross, 468 U.S. 1, 11 (1984); Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977); see also Teague v. Lane, 489 U.S. 288, 298 (1989); Tacho v. Martinez, 862 F.2d 1376, 1380 (9th Cir. 1988).  "Cause" is the legitimate excuse for the default.  Thomas v. Lewis, 945 F.2d 1119, 1123 (9th Cir. 1991).  "Prejudice" is actual harm resulting from the alleged constitutional violation.  Id.

     "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'"  Harmon v. Barton, 894 F.2d 1268, 1274 (11th Cir.)(quoting Reed, 468 U.S. at 13), cert. denied, 498 U.S. 832 (1990).  The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, (citation omitted), or that "some interference by officials," (citation omitted), made compliance impracticable, would constitute cause under this standard.

Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Harmon, 894 F.2d at 1275; Allen v. Risley, 817 F.2d 68, 69 (9th Cir. 1987). The standard is one of discretion intended to be flexible and yielding to exceptional circumstances.  Hughes v. Idaho State Board of Corrections, 800 F.2d 905, 909 (9th Cir. 1986).  The "cause and prejudice" standard is equally applicable to pro se litigants, Harmon, 894 F.2d at 1274; Hughes, 800 F.2d at 908,

---

[1]Appellate defaults are examined under the same standards that apply when a defendant fails to preserve a claim during trial. Smith v. Murray, 477 U.S. 527, 533 (1986).

11

1   whether literate and assisted by "jailhouse lawyers," <u>Tacho</u>, 862

2   F.2d at 1381; illiterate and unaided, <u>Hughes</u>, 800 F.2d at 909, or

3   non-English speaking.  <u>Vasquez v. Lockhart</u>, 867 F.2d 1056, 1058

4   (9th Cir. 1988), <u>cert. denied</u>, 490 U.S. 1100 (1989).

5        Finally, if a claim has been found to be procedurally

6   defaulted, the failure to establish cause for the default may be

7   excused under exceptional circumstances.  For instance:

8            ... in an extraordinary case, where a constitutional
             violation has probably resulted in the conviction of one
9            who is actually innocent, a federal habeas court may
             grant the writ even in the absence of showing cause for
10           the procedural default.

11  <u>Murray</u>, 477 U.S. at 496; <u>see also</u> <u>Schlup v. Delo</u>, 513 U.S. 298,

12  327 (1995)(to meet the <u>Murray</u> standard, "the petitioner must show

13  that it is more likely than not that no reasonable juror would

14  have convicted him in the light of the new evidence").

15       **B. Application of Law to Facts of the Case**

16       Respondents first contend petitioner's habeas claims are

17  procedurally barred because he failed to properly exhaust his

18  state court remedies by failing to present these claims to the

19  Arizona Supreme Court.

20       In <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838 (1999), the U.S.

21  Supreme Court held that in order to properly exhaust state court

22  remedies for purposes of federal habeas review, a petitioner was

23  required to file petitions for discretionary review in state

24  supreme courts "when that review is part of the ordinary appellate

25  review procedure in the State ..." <u>O'Sullivan</u>, 526 U.S. at 847.

26  The Court qualified this requirement, however, by stating "nothing

27  in our decision today requires the exhaustion of any specific

28                                    12

1   state remedy when a State has provided that that remedy is

2   unavailable."   Id.

3        Following up on O'Sullivan, in Swoopes v. Sublett, 196 F.3d

4   1008 (9th Cir. 1999), the Ninth Circuit Court of Appeals held that

5   under Arizona law a habeas applicant need not seek review in the

6   Arizona Supreme Court to fully exhaust state remedies unless the

7   applicant has been sentenced to death or life in prison.  For

8   state prisoners given sentences less than death or life in prison,

9   appeal or review by the Arizona Supreme Court is "unavailable,"

10  within the meaning of O'Sullivan.  Swoopes, 196 F.3d at 1010.

11       Respondents appear to argue that Swoopes was wrongly decided,

12  especially in light of the subsequently decided U.S. Supreme Court

13  case of Baldwin v. Reese, 541 U.S. 27 (2004).  They contend that

14  petitioner's failure to seek review of his habeas claims in the

15  Arizona Supreme Court either on direct appeal or in a Rule 32

16  proceeding renders the claim unexhausted and, ultimately,

17  procedurally defaulted.

18       Upon review, nothing in Baldwin either explicitly or

19  implicitly overrules the Ninth Circuit's holding in Swoopes.

20  Nothing in Baldwin contradicts the statement in O'Sullivan to the

21  effect that "nothing in our decision today requires the exhaustion

22  of any specific state remedy when a State has provided that that

23  remedy is unavailable." O'Sullivan, 526 U.S. at 847.  Swoopes

24  picked up on this passage from O'Sullivan and held that Arizona

25  has provided that appeal or review to the Arizona Supreme Court is

26  not "available" to inmates who have not been sentenced to death or

27  life in prison.  Swoopes, 196 F.3d at 1010.  As a result, for

28                                  13

purposes of federal habeas exhaustion, Arizona inmates challenging
their state court convictions on federal habeas review, who have
not been sentenced to death or life in prison, properly exhaust
state remedies when they either appeal or seek post-conviction
review in the Arizona Court of Appeals.  Swoopes is still good law
and the Court is bound by it.  As a result, respondents'
contention that petitioner's habeas claims are unexhausted and now
procedurally defaulted because petitioner failed to raise these
claims before the Arizona Supreme Court is without merit.

        Alternatively, respondents argue that Grounds V, VI, VIII,
IX, X and XI are procedurally barred for other reasons.

        With respect to Ground V (alleging his 5th and 6th Amendment
rights were violated when the trial court denied his request for
leave to submit additional information and material to impeach the
medical examiner's testimony that the victim was shot 4 or 5
times), respondents assert the claim is not cognizable on habeas
review because the claim was not presented in state court as a
violation of federal law or petitioner's federal constitutional
rights.  Upon review, petitioner presented this issue in his brief
in support of his Rule 32 in the Arizona Court of Appeals only as
a question of state law. (See Doc. 11, Exhibit SS at pp. 18-20).
Petitioner never raised this issue as a violation of his federal
constitutional rights.  As a result, the federal nature of the
claim raised in Ground V was not exhausted in state court.
Because the time to raise this claim has long since passed the
claim is procedurally defaulted.  Petitioner has presented no
cause for the default nor has he presented evidence of actual

innocence which might support considering the claim despite the
default.  This claim should be denied.

In Ground VI, petitioner alleges his trial counsel rendered
ineffective assistance when he failed to object to "repeated"
instances of prosecutorial misconduct during closing.  (Doc. 1 at
p. 10 and Attachments).  Respondents assert the Arizona trial
court found this claim precluded pursuant to Ariz.R.Crim.P.
32.2(a) and, thus, it is now procedurally defaulted.

Review of petitioner's brief in support of his Rule 32
petition filed in the trial court and his petition for review
filed in the Arizona Court of Appeals indicates he did raise a
claim of ineffective assistance based on counsel's failure to
challenge "prosecutorial misconduct set forth in the direct
appeal, ..."  (Doc. 11, Exhibits MM at p. 20; SS at pp. 14-15).
The trial court rejected this claim as precluded pursuant to
Ariz.R.Crim.P. 32.2(a)(2).  The trial court appears to have
predicated this conclusion on its finding that the underlying
claim of prosecutorial misconduct was "fully litigated on [direct]
appeal."  Alternatively, the trial court concluded the claim was
without merit.  (See Doc. 11, Exhibit RR at p. 1).  The Arizona
Court of Appeals denied review without comment.  (Id. at Exhibit
TT).

Upon review, the Court believes petitioner has properly
exhausted this claim for purposes of federal habeas review.
Irrespective of the trial court's finding that the claim was
precluded, petitioner was required by Arizona law to raise any
claim of ineffective assistance of counsel in a Rule 32 proceeding

1    and not on direct appeal.  <u>State v. Spreitz</u>, 39 P.3d 525, 527

2    (Ariz. 2002) ("ineffective assistance of counsel claims are to be

3    brought in Rule 32 proceedings.  Any such claims improvidently

4    raised in direct appeal, henceforth, will not be addressed by

5    appellate courts regardless of merit.").  In light of this

6    specific holding by the Arizona Supreme Court, petitioner's

7    presentation of this claim in his Rule 32 proceeding rather than

8    on direct appeal constituted proper exhaustion for purposes of

9    federal habeas review.

10       In Ground VIII, petitioner raises several issues alleging

11   violations of his federal constitutional rights, including: (1)

12   the trial court violated his due process rights when it refused to

13   allow him to present evidence that Wendy Danley, petitioner's

14   fiancé and the victim who was shot and killed, had a prior history

15   of violence and suicide, while permitting the prosecution to

16   present evidence she was not violent; (2) trial counsel rendered

17   ineffective assistance of counsel when he failed to use papers

18   from Wendy Danley's divorce to her first husband to impeach

19   another witness, William Boehme, who testified Danley was not

20   violent toward others; (3) the trial court prevented petitioner

21   from presenting evidence that he killed Wendy Danley in self-

22   defense.  (Doc. 1 at pp. 12 and Attached p. 12-1).  Issues (1) and

23   (3) as presented in petitioner's brief are essentially the same

24   claim.

25       With respect to that portion of Ground VIII alleging

26   petitioner's due process rights were violated when he was

27   prevented from presenting evidence of the victim's violence and

28                                    16

her suicide attempts to support his claim of self-defense, the Arizona Court of Appeals refused to consider this claim on the merits on direct appeal because petitioner failed to cite any portion of the record that actually showed the trial court prevented him from presenting such evidence.  (See Doc. 11, Exhibit KK at pp. 22-23).  The Court of Appeals noted that "petitioner has a duty to cite the record to support his arguments" and that [b]ecause he has failed to do so, we decline to address this argument."  (Id. at p. 23).

Petitioner has not properly exhausted a habeas claim unless he has fairly presented it in state court.  Petitioner did not fairly present this claim in state court.  See Copeland v. Roettgen, 33 F.3d 36, 38 (9th Cir. 1994) ("Submitting a new claim ... in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation.").  As a result, because the time to properly present this issue in state court has long passed, the claim has been procedurally defaulted.  For this reason, and because petitioner has not presented a colorable claim of actual innocence, the claim should be procedurally barred from federal habeas review.

With regard to the other issue raised in Ground VIII, that trial counsel rendered ineffective assistance of counsel by failing to introduce at trial the victim's divorce papers from her first marriage to impeach a prosecution witness who testified the victim was not violent, respondents assert this issue was not raised in state court.  Review of the record shows that no claims

of ineffective assistance of counsel were raised on direct appeal and that no specific claim concerning impeaching William Boehme's testimony with the victim's divorce papers was raised in the Rule 32.  Petitioner has presented no cause for failing to raise this claim of ineffective assistance in state court and the claim is procedurally defaulted.  Petitioner has presented no colorable evidence of actual innocence which would permit the Court to ignore the procedural default and the claim should be denied.

Respondents next assert that Grounds IX, X and XI are procedurally defaulted because petitioner acknowledges he never presented the substance of these claims in state court.  Review of the habeas petition reveals petitioner did not indicate he presented these claims in state court.  Petitioner argues in his reply that these claims are not procedurally defaulted because he did present the substance of these issues to his post-conviction review attorney.  (Doc. 17 at p. 16).  Even if true, this is not a basis to excuse the default.  Petitioner has no constitutional right to counsel in a post-conviction relief proceeding and, thus, any allegation of misconduct cannot provide a basis for cause.  See Bonin v. Vasquez, 999 F.2d 425, 429 (9th Cir. 1993).

**III. MERITS OF PROPERLY EXHAUSTED CLAIMS**

Grounds I-IV and VI-VII have been properly exhausted and will be considered on the merits.

**A. Habeas Standard of Review**

Under the AEDPA the issuance of a writ of habeas corpus is limited to circumstances in which the state court adjudication "resulted in a decision that was contrary to, or involved and

18

1    unreasonable application of, clearly established Federal law, as

2    determined by the Supreme Court of the United States ... or

3    resulted in a decision that was an unreasonable determination of

4    the facts ..."  28 U.S.C. §2254(d)(1) and (2).  "[A] state court

5    decision applies 'clearly established' Supreme Court law under the

6    AEDPA when it 'applies a rule dictated by [Supreme Court]

7    precedent existing at the time the defendant's conviction became

8    final." Campbell v. Rice, 265 F.3d 878, 889 (9th Cir.

9    2001)(citing Williams v. Taylor, 529 U.S. 362, 376 (2001)).  As

10   stated by the U.S. Supreme Court:

> Under the "contrary to" clause, a federal habeas court
> may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts.  Under the 'reasonable
> application' clause, a federal habeas court may grant
> the writ if the state court identifies the correct
> governing legal principle from this Court's decisions
> but unreasonably applies that principle to the facts of
> the prisoner's case.
>
> ...
> [A]n unreasonable application of federal law is
> different from an incorrect application of federal law
> ...a federal habeas court may not issue the writ simply
> because that court concludes in its independent judgment
> that the relevant state court decision applied clearly
> established federal law erroneously or incorrectly.
> Rather, the application must also be unreasonable.

Williams, 529 U.S. at 411, 412-13 (O'Connor, J., concurring in

part, and concurring in the judgment).  "In order for a state

court's application of federal law to be unreasonable, it must

have been clearly erroneous." Van Tran v. Lindsey, 212 F.3d 1143,

1152-54 (9th Cir. 2000).  "Petitioner cannot meet his burden by

simply convincing the federal court that he has the better of two

19

reasonable legal arguments." Wildman v. Johnson, 261 F.3d 832,

837 (9th Cir. 2001)(citing Van Tran, 212 F.3d at 1154)).

**B. Merits of Petitioner's Remaining Claims**

**1. Trial Evidence**

Before addressing petitioner's properly exhausted claims, the

Magistrate Judge will summarize the gist of the evidence presented

at trial.   The Arizona Court of Appeals summarized the evidence

presented at trial in its decision on appeal.   Upon review of the

record, the Magistrate Judge believes the summary accurately

reflects the trial record.   The Court summarized the evidence as

follows:

> [Petitioner] and [Wendy Danley] were engaged to be
> married.  Although the couple had a history of arguing
> ... they continued to live together with Wendy's father
> and her two children.  While living in the house,
> [petitioner] owned two handguns, a .22 Beretta and a .22
> Jennings, the first of which he customarily kept loaded
> under his pillow while he slept.
>
> In the early morning hours of May 1, 1997, each gun
> was fired.  Wendy was shot five times, three times in
> the head, once in the shoulder and once in the neck.
> [Petitioner] suffered a gunshot wound to his head and
> passed out.  Neither the neighbors nor the other members
> of the household were awakened by this commotion.
>
> Approximately two hours after the shooting, at 3:30
> a.m., [petitioner] awoke, washed his hands, held a sock
> to his forehead to stop the bleeding and called 9-1-1.
> While noticing that Wendy was making gurgling sounds, he
> never alerted the members of Wendy's family of her
> condition.  He told the 9-1-1 operator he did not know
> who had shot him and Wendy.
>
> Within minutes of receiving the telephone call,
> police officers and paramedics arrived. [Petitioner] was
> calm and responsive. Although he subsequently altered
> his explanation of the shooting, [petitioner] initially
> told police officers he did not know who had shot him.
> Specifically, Officer Stephen Laird asked [petitioner]
> what had happened, and [petitioner] stated he did not
> know who had shot him and Wendy but that this person was

no longer in the house.  He later repeated these statements to Officer John Ferris, another officer at the scene, and added that he must have been shot with a small-caliber gun.

Both Wendy and [petitioner] were transported to a hospital for treatment.  While preparing to go to the hospital, Officer Laird asked [petitioner] about two holsters found on the bed. [Petitioner] stated that he had owned two guns but that he lost his Jennings in the desert.

[Petitioner] was examined in the emergency room. He told hospital personnel that he had consumed ten to twelve beers that night, and, when tested, his blood-alcohol content was .231.  Nonetheless, according to hospital personnel, he answered questions appropriately, ...

[Petitioner] was questioned by several police officers at the hospital.  At 5:45 a.m., Officer Jeff Kendall arrived there and located [petitioner] ... [Petitioner] appeared awake and coherent.  Officer Kendell swabbed [petitioner's] hands, and, although [petitioner] was not in custody, the officer informed [him] of his <u>Miranda</u> rights before asking him any questions. [Petitioner] indicated that he understood his rights and reiterated that he did not remember what had happened.  Specifically he did not recall arguing with Wendy that evening.  He admitted that he owned a .22 caliber Beretta and a rifle, and that he had handled the Beretta that evening, but he did not remember why.  When [petitioner] said that he did not want to talk anymore, Officer Kendell left.

Meanwhile, investigating officers found in the house three casings from the Beretta and two from the Jennings.  A third casing had jammed in the Jennings after firing.

Prior to undergoing surgery, [petitioner] again spoke to Officers Ferris and Kendell.  During a ten - to twenty-minute conversation with Officer Ferris, [petitioner] repeated that he did not know who had shot him and Wendy.  He said that he was walking to the bathroom when he was shot but that he had not seen anyone.  He also stated that he did not remember arguing with anyone that night.

Some time later, while [petitioner] still was awaiting surgery, Officer Kendell spoke with [him] and told him that Wendy had said that [petitioner] had shot her. [Petitioner] replied, "No way, no way."  When asked

21

why Wendy would have said that, he said, "I don't know ... I will deal with it later" ....

[Petitioner] was in surgery from about 10:30 a.m. to 12:30 p.m.  By 3:30 p.m., he was alert, and he subsequently was interviewed by Detective Lawrence Baggs and then Detective Allen Reed.

Detective Baggs first spoke with [petitioner] in intensive care at approximately 5:30 p.m. [Petitioner] repeated that he did not know who had shot him and Wendy.  The detective asked him whether he owned a Jennings, and [petitioner] said that he used to own one but that he had lost it in the desert six months before. When Detective Baggs then told [him] that police officers had found the Jennings under his bathroom carpet, [petitioner] had no explanation.

Several hours later, Detective Reed spoke with [petitioner]. [Petitioner] again denied having argued with Wendy the night before.

[Petitioner] was discharged from the hospital on May 3, [1997].  Wendy, however, died on May 12, [1997], from one of the gun shot wounds to her head.

Unaware Wendy had died earlier that day, on May 12, [petitioner] and his father went to the police station to reclaim some personal items seized during the investigation.  While there, [petitioner] asked to speak to Detective Baggs.  The detective explained that [petitioner] was not under arrest and that he could leave at any time. [Petitioner] repeated the story that he did not know who had shot him and Wendy, and he provided additional details about having lost his Jennings in the desert.  He suggested that, perhaps, the Jennings he had lost in the desert was a different one than the one that matched the receipt found under his bed.  After [he] was informed that Wendy had died, he maintained that he had told everything he knew about the incident and then left.

[Petitioner] was arrested on May 19, 1997, and charged with Wendy's murder.  At trial, he conceded that he had in fact killed Wendy, but he claimed it was in self-defense. [Petitioner] testified that Wendy had shot him, but that he had lied to police officers, friends and family in order to protect her.

According to [petitioner], on the evening of April 30, 1997, he had been drinking after returning home from work.  He and Wendy began arguing about their relationship.  During this fight, [petitioner]

1    threatened to leave Wendy and asked her to return the
     engagement ring.  The argument later ended and both of
2    them went to bed.

3        He contended that he was shot in the head while he
     was sleeping, that he had jumped up, grabbed his Beretta
4    from under his pillow and rolled off the bed.  He said
     that another shot had hit a pillow on the bed as he
5    crawled around it and that he then had stood and fired
     his Beretta three or four times at the unknown
6    assailant.  It was only after he turned on the light
     that he had discovered that he had shot Wendy and thrown
7    the Beretta on the bed.  He denied shooting the Jennings
     that evening but, rather, claimed that he found it on
8    the floor in front of Wendy.  He admitted, however, that
     he must have hidden it under the carpet behind the
9    toilet although he denied remembering having done so.

10       [Petitioner] testified that he then had become
     unconscious and fallen to the floor.  When he later
11   awakened, lying on the bed, he noticed that the Jennings
     was missing and that Wendy had not moved.  He proceeded
12   to wipe the blood off himself before checking Wendy, who
     was making a gurgling sound.  He washed and went in the
13   living room to call 9-1-1.

14       The jury found [petitioner] guilty of second degree
     murder.  He was sentenced to the presumptive term of 16
15   years, ...

16   (Doc. 11, Exhibit KK at pp. 2-7).

17       **2. Petitioner's Grounds for Relief**

18       Grounds I-IV raise various claims of ineffective assistance

19   of trial counsel.

20       a. Law Generally

21       Claims of ineffective assistance are analyzed pursuant to

22   Strickland v. Washington, 466 U.S. 668 (1994).  In order to

23   prevail on such a claim, petitioner must show:

24       1. Counsel's representation fell below the objective
         standard for reasonableness; and
25

26       2. There is a reasonable probability that, but for
         counsel's unprofessional errors, the result of the
         proceeding would have been different.
27

28                                  23

Strickland, 466 U.S. at 687-88, 694; see also United States v. Thornton, 23 F.3d 1532, 1533 (9th Cir. 1994)(per curiam); United States v. Solomon, 795 F.2d 747, 749 (9th Cir. 1986).

This two-pronged test "deficient performance and prejudice" poses a mixed question of law and fact. Strickland, 466 U.S. at 698; Thompson v. Calderon, 86 F.3d 1509, 1515 (9th Cir. 1996). The court hearing an ineffective assistance of counsel claim must consider the totality of the evidence with an eye toward the ultimate issue of whether counsel's conduct so undermined the functioning of the adversarial process that the proceeding lacked fundamental fairness. Strickland, 466 U.S. at 686; Card v. Dugger, 911 F.2d 1494 (11th Cir. 1990)(observing that counsel cannot be labeled ineffective for failing to raise issues which have no merit). Reasonableness is judged from counsel's perspective at the time of the alleged error in light of all the circumstances. Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); Strickland, 466 U.S. at 689.

Deficient performance is one in which counsel's errors were so great he or she was not functioning as the counsel guaranteed by the Sixth Amendment. Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986). To prove such ineffectiveness, a petitioner must demonstrate that counsel's actions were "outside the wide range of professionally competent assistance, and that the deficient performance prejudiced the defense." United States v. Houtchens, 926 F.2d 824, 828 (9th Cir. 1991)(quoting Strickland, 466 U.S. at 687-90). There is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance and

that, under the circumstances, the challenged action might be considered sound trial strategy.  United States v. Quinterro-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995), cert. denied, 519 U.S. 848 (1996); United States v. Molina, 934 F.2d 1440, 1447 (9th Cir. 1991).

When assessing prejudice, the court should not focus solely upon the outcome.  Rather, the governing legal standard in determining prejudice is "whether counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair."  Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

In short, the court's scrutiny is highly deferential and every effort should be made to eliminate the distorting effects of hindsight.  Kimmelman, 477 U.S. at 381; United States v. Natanel, 938 F.2d 302, 309-10 (1st Cir. 1991)("The performance standard is to be applied not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented."), cert. denied, 502 U.S. 1079 (1992); Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991).  Moreover, cursory allegations that are purely speculative cannot support a claim of ineffective assistance of counsel.  Shah v. United States, 878 F.2d 1156, 1161 (9th Cir.), cert. denied, 493 U.S. 869 (1989).

b. Petitioner's Claims of Ineffective Assistance

**GROUNDS I, II AND III**

In Grounds I, II and III, petitioner raises claims alleging that trial counsel rendered ineffective assistance by failing to call various experts to refute prosecution evidence.  In Ground I,

petitioner contends defense counsel knew petitioner's defense was
self-defense and yet "was unable to capatalize [sic] ... as he
never offered any expert testimony to show how [petitioner's]
defense was prejudiced as a result of this one sided investigation
by unprofessional detectives."  (Doc. 1 at p. 5 and 5-1).  He
contends counsel should have brought in a crime-scene
reconstructionist.  In Ground II, petitioner asserts counsel
rendered ineffective assistance by failing to call a ballistics
expert to refute the testimony of the State's experts that the
victim was shot five times.  (Doc. 1 at p. 6 - 6-3).  In Ground
III, petitioner contends counsel was ineffective for not calling a
forensic pathologist to counter the two pathologists called by the
State.  (Doc. 1 at pp. 7 - 7-2).

      The trial court denied relief with respect to the claim that
trial counsel was ineffective for failing to call these experts.
The court stated in its denial of Rule 32 relief:

> [Petitioner] argues that his trial counsel was
> ineffective for failing to consult or call a
> pathologist, ballistics experts, and crime scene
> reconstructionist .... [Petitioner] has failed to
> establish a colorable claim that his trial counsel was
> ineffective for failing to rebut the State's witnesses
> with experts testimony.  In fact, [petitioner's] trial
> counsel was able to effectively exploit the odd
> circumstances of the crime, the investigation by law
> enforcement authorities, and the medical examiner's
> testimony and admission of error.  The expert opinions
> would not have given the jury a reason to reach a
> different verdict ....

(Doc. 11, Exhibit RR at p. 2).  The trial court did not cite
federal law or the federal constitution in reaching its decision.
Nevertheless, its determination must be upheld unless it is
contrary to federal law or its application of the facts is

26

unreasonable in light of the evidence presented.

**GROUND I**

With respect to Ground I (failure to call an expert in crime scene reconstruction), petitioner asserts that counsel failed to "collect" evidence to support his claim of self-defense and failed to investigate whether anyone besides petitioner could have killed Wendy.  (Doc. 1 at p. 5).  This claim is without merit.

As noted by both petitioner and respondents, the record shows that counsel argued extensively the angle of an improper investigation by police which failed to preserve critical evidence.  (See Doc.11, Exhibit R at pp. 38-42).  In addition, the defense obtained an instruction pursuant to State v. Willits, 393 P.2d 274, 279 (Ariz. 1964) instructing the jury:

> If you find that the State has lost, destroyed, or, in this case, failed to preserve evidence - ... whose contents or quality are important to the issues in this case, then you should weigh the explanation, if any, given for the loss or unavailability of the evidence. If you find such explanation is inadequate, then you may draw an inference unfavorable to the State, which in itself may create a reasonable doubt as to the defendant's guilty.

(Doc. 11, Exhibit R at pp. 42 and 89).  This Willits instruction, petitioner's own lengthy testimony at trial, and counsel's closing argument, as well as counsel's extensive cross-examination of police who investigated the crime scene, belie petitioner's claim of ineffective assistance of counsel.  Counsel argued that numerous errors by police made their findings questionable.  For instance, he highlighted the fact that investigators failed to bag Wendy's hands so they could later check and see if tests could show whether she had discharged a firearm.  He argued they also

27

failed to take photographs of her wounds, failed to test Wendy's
blood alcohol content and failed to question the state's forensic
experts, Drs. Carrion and Keen, early on in the investigation.
(See id. at pp. 38-39).

Further, as noted by respondents, if counsel had called a
crime scene reconstructionist, the expert would have been subject
to cross-examination by the prosecution as to those things police
did well and this could have hurt petitioner's defense.  Under
these circumstances, and in light of the arguments, cross-
examination and the Willits instruction, counsel's decision not to
call a crime scene reconstructionist was within the bounds of
reasonable judgment and does not constitute ineffective assistance
of counsel.

**GROUND II**

In Ground II, petitioner contends counsel was ineffective in
failing "to properly investigate through ballistics whether [the]
prosecution's theory of [the victim] being shot 5 times had any
merit."  (Doc. 1 at p. 6).   In particular, petitioner cites
counsel's failure to retain the services of a ballistics expert
"to review all scientific evidence and develop crucial facts to be
used at trial."  (Id.).

Petitioner argues that a ballistics expert could have aided
him in refuting the State's expert testimony that the victim was
shot five times.  (Doc. 1 at p. 6).   In particular he cites a
report prepared by Ed Love for his state Rule 32 that he claims
refutes the State's contention that five shots were fired at the
victim.   (See id.).

Petitioner's arguments amount to pure speculation.
Petitioner merely re-argues the quantum of the ballistics evidence
presented at trial to support the prosecution's theory that the
victim was shot five times.  (See Doc. 11 at Exhibit OO).  The
Magistrate Judge has reviewed the report of Ed Love cited by
petitioner.  Although, the report by Love does question some of
the evidence of the prosecution experts on this point, such as
noting the fact that the victim suffered only three wounds, this
does not directly contradict the five-bullet theory.

As noted by respondents, Love's report does not directly
challenge the prosecution's theory that five bullets or five
separate bullet fragments entered the victim.  (See Doc. 11 at
Exhibit OO).  Petitioner's claims are speculative, unsubstantiated
and insufficient to support a claim that defense counsel was
ineffective for not calling a ballistics expert.

**GROUND III**

In Ground III, petitioner asserts counsel was ineffective for
failing to call a forensic pathologist to testify on his behalf at
trial.  (Doc. 1 at p. 7 and Attachments).  Specifically, he
contends that defense counsel should have called a forensic expert
to refute testimony by two prosecution experts, Drs. Carrion and
Keen.  (See id.).

Dr. Carrion testified he treated the victim, Wendy Lou
Danley, the day she was brought to the hospital.  He testified he
observed six wounds to Wendy's head, but that only one actually
penetrated into the brain.  (Doc.  11, Exhibit E at p. 19).  Dr.
Carrion testified Wendy received three separate gunshot wounds to

the head and two separate gunshot wounds to the neck and shoulder. (Id. at p. 42).  Dr. Carrion opined that these five separate gunshot wounds were inflicted from different angles of entry. (Id. at p. 46).

Dr. Carrion also testified that he treated petitioner for one gunshot wound to his forehead.  (Doc. 11, Exhibit E at p. 51). Dr. Carrion testified the bullet went down into the area behind his nose, lodging in a sinus.  (Id.).  Dr. Carrion noted evidence of stripling (gunpowder residue) to the area of petitioner's wound, which he opined meant the gun was fired within 12 inches of the wound.  (Id. at pp. 53-54).  He noted that petitioner was released within two days and suffered no lasting injury from the gunshot wound.  (Id. at p. 58).

On cross-examination, petitioner's counsel questioned Dr. Carrion about his opinions.  Dr. Carrion stated that he could not state with certainty that the two wounds to the neck and shoulder were gunshot wounds.  He also conceded that he did not factor in the potential for ricochet as the cause of the three separate gunshot wounds to the head (thus creating the possibility that less than three shots were fired into Wendy's head).  Dr. Carrion stated he thought ricochet was unlikely given the caliber of the bullets (.22) but noted he was not a ballistics expert.  (Doc. 11, Exhibit E at pp. 61-91).  In addition, Dr. Carrion opined that the gunshot wound to petitioner was not likely self-inflicted. However, on re-direct he stated that it is possible that the wound was self-inflicted.  (Id. at p. 94).  Dr. Carrion further stated that if petitioner inflicted this gunshot wound on himself in this

manner, it is not a very "efficient" way to commit suicide.
(Id.).

The State also called Dr. Philip Keen, the then-Chief Medical
Examiner for Maricopa and Yavapai Counties.  Dr. Keen stated he
performed the autopsy on Wendy on May 13, 1997, the day after she
died.  (Doc. 11, Exhibit H at pp. 5-7).  Dr. Keen's conclusions
were consistent with Dr. Carrion's as to the likely number of
gunshots fired at Wendy.  He stated he believed Wendy was shot at
least twice, and very likely three times in the head.  He also
believed she received at least one gunshot wound in the neck and
shoulder, but was not certain if one of the bullets that inflicted
one of the head wounds (only one of the three bullets that went
into the head remained in the head) could also have caused the
injury to the shoulder.  (See id. at pp. 14-16).  He believed at
least four and possibly five shots hit Wendy.  (Id. at p. 16).

Dr. Keen also examined X-rays of the wound sustained by
petitioner.  He opined that it was possible the wound was self-
inflicted, but more likely the wound was indicative of being shot
by someone else.  Dr. Keen stated that if the wound was self-
inflicted, it was done in a manner that is unusual for someone
wishing to commit suicide.  (Doc. 11, Exhibit H at pp. 30-39).

Petitioner asserts that a defense expert in forensics, such
as Dr. Bux, an expert petitioner states he retained for his Rule
32, should have been called at trial.  He contends that had such
an expert been called he or she could have refuted the conclusions
of Drs. Carrion and Keen, particularly with respect to their
opinions that at least four and likely five bullets hit Wendy.

1    Petitioner's claim is without merit.  Petitioner merely

2    engages in self-serving speculation as to whether calling Dr. Bux

3    or any other defense expert in forensics would have made a

4    difference.  Trial counsel vigorously cross-examined Dr. Carrion.

5    Although counsel did not cross-examine Dr. Keen, Dr. Keen, like

6    Dr. Carrion, made statements favorable to petitioner, particularly

7    in regards to their belief that it is unlikely the wound he

8    sustained was self-inflicted (thus, supporting his claim he shot

9    Wendy in self-defense).  Under these circumstances, petitioner has

10   not presented enough evidence to support a finding that counsel

11   rendered ineffective assistance of counsel in failing to call a

12   defense expert in forensics.

13        **GROUND IV**

14    In Ground IV, petitioner asserts counsel was ineffective for

15   not "adequately advis[ing] [him] of the risks associated with

16   going to trial relative to accepting the plea offer."  (Doc. 1 at

17   p. 8).  According to petitioner, the State offered him a plea to

18   negligent homicide which he turned down on counsel's advice.  To

19   prevail on this claim, petitioner must show that there is a

20   reasonable probability that, but for counsel's errors, he would

21   not have gone to trial, but rather would have insisted on pleading

22   guilty.  <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

23    In an affidavit filed in support of his Rule 32 on this

24   issue, petitioner states that "[h]ad I known the State's position

25   and evidence, it might have impacted my decision on whether to

26   accept the plea offer."  (Doc. 11, Exhibit QQ at p. 2 (para. 5)).

27   Petitioner states only that had he known more about the State's

28                                   32

position and evidence, it "might" have impacted his decision. However, to support a viable claim, petitioner must show a reasonable probability his greater knowledge of the State's position and evidence would have caused him to accept the plea. See Cooper v. Calderon, 255 F.3d 1104, 1109 (9th Cir. 2001) (The prejudice prong in Strickland "requires showing more than the possibility that [petitioner] was prejudiced by counsel's errors; he must demonstrate that the errors actually prejudiced him."). Petitioner has not made such a showing.

In his habeas petition, petitioner states that "[h]ad [he] known of the limited defense counsel intended to offer, the states false evidence and position prior to trial theres [sic] a good probability that [he] would have accepted the plea offer." This statement is self-serving and conclusory. Petitioner fails to support his claim that counsel presented a limited defense. The record belies this. Counsel vigorously cross-examined witnesses, including experts, obtained a Willits instruction, and petitioner testified extensively in support of his claim that he acted in self-defense.

In addition, if petitioner believes that the evidence presented by the prosecution is false, and that he really acted in self-defense in shooting Wendy, it is not reasonable to assume he would have pleaded guilty to negligent homicide. Petitioner is merely seeking a second bite at the apple. He does not say he was coerced into rejecting the plea. He merely argues that if certain unspecified evidence had been made known to him, he might have taken the plea. The evidence and petitioner's vigorous defense of

33

his actions at trial, as well as the issues raised on appeal and
in his Rule 32 contradict this.  This claim should be denied.

**GROUND VI**

In Ground VI, petitioner asserts trial counsel was
ineffective for failing to object to "repeated instances of
prosecutorial misconduct occurring throughout his trial ..."
(Doc. 1 at p. 10).  In particular, petitioner cites the
prosecutors "personal attack on opposing counsel."  Petitioner
argues the prosecutor accused defense counsel of engaging in
speculation about whether Wendy shot a round as she was falling
down (after she was shot), as well as accusing defense counsel and
petitioner of fabricating a self-defense defense, and challenging
the defense claims concerning the number of bullets fired.  (See
Doc. 1 at p. 10).

This claim is without merit.  Closing argument is the time to
frame the evidence in the light most favorable to a party.  The
Court has reviewed the prosecutor's closing argument and finds no
constitutional violations from any of counsel's closing arguments.
The Arizona Court of Appeals addressed this issue on appeal and
found the closing arguments made by the prosecutor to be either
proper argument or, if not strictly proper, lacking in prejudice.
(Doc. 11, Exhibit KK at pp. 9-22).

Upon review, the Magistrate Judge believes that the Arizona
Court of Appeals conclusions were not contrary to federal law or
an unreasonable determination of the facts and should be upheld on
habeas review.  Petitioner's claims are without merit.

34

**GROUND VII**

In this ground, petitioner contends his appellate counsel rendered ineffective assistance because he was unable to obtain a transcript of a pre-trial "voluntariness" hearing held on May 29, 1998, to challenge the trial court's determination that his statements to police at the hospital on the night of the incident were voluntary and, thus, constitutionally proper. (<u>See</u> Doc. 1 at p. 11).

Petitioner contends he was interrogated by police while receiving treatment at the hospital and argues that these statements were involuntary and the questioning was not in compliance with the standards outlined in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). (<u>See</u> Doc. 11 at pp. pp. 11 - 11-4). Specifically, petitioner asserts that the totality of the circumstances surrounding his hospital questioning support a "prima [facie] case that [his] pre-arrest statements were involuntary." (<u>Id.</u> at p. 11-1). He contends that the answers he gave in response to questioning by officers at the hospital on May 1, 1997 (the day of the incident), while awaiting surgery and later that day after surgery, were not voluntary because he "was seriously injured, medicated, awaiting brain surgery and intoxicated when police repeatedly questioned him without advising him of his [M]iranda rights." (<u>Id.</u>).

Petitioner also alleges that police improperly tried to deceive him by telling him that the victim identified him as the person who shot her. He contends "police deceit, [his] physical and mental incapacity, and influence of pain medication render[ed]

[his] statements involuntary," especially when considered under the totality of the circumstances.  (Doc. 1 at p. 11-2).

Petitioner raised his claim that appellate counsel was ineffective for not providing a transcript of the voluntariness hearing in his Rule 32 petition.  (See Doc. 11, Exhibit MM at pp. 21-22; Exhibit SS at pp. 15-18).  He argued counsel's failure to obtain a transcript of the voluntariness hearing prevented him from prevailing on the claim on direct appeal that his statements at the hospital were made in violation of Miranda.  (Doc. 11, Exhibit KK at p. 8).

The Strickland standard applies to claims of ineffective assistance of appellate counsel, although the prejudice prong is modified to require a showing that "but for counsel's unprofessional errors, [petitioner] would have prevailed on appeal."  Crockett v. Ray, 333 F.3d 938, 944 (9th Cir. 2003).

The Arizona Court of Appeals denied petitioner's free-standing Miranda claim on direct appeal, noting the trial court found the statements "legally obtained and admissible."  (Doc. 11, Exhibit KK at p. 8).  The state Court of Appeals did base its denial on the fact that petitioner "failed to provide a transcript of the May 29, 1998, [voluntariness] hearing for this court to consider .... [and] by failing to provide a sufficient record on appeal, the defendant has waived review of this issue, and we uphold the trial court's decision to admit the statements."  (Id. at p. 9).

In denying Rule 32 relief, the trial court stated:

36

While [petitioner] argues that his appellate counsel was ineffective for failing to provide a transcript of the May 29, 1998 hearing for the appellate court to consider the issue of voluntariness, [petitioner] has failed to show that any deficiency prejudiced him.  The [trial court] held a hearing to determine whether [petitioner's] statements were voluntary and in compliance with <u>Miranda</u>.  The Court ruled that the statements were legally obtained and admissible.  The witnesses who testified at the voluntariness hearing also testified at trial.  At trial [petitioner] had the opportunity to cross-examine the witnesses and emphasize any inconsistencies in the testimony at the voluntariness hearing and at trial.  Therefore, the trial testimony and any variance with the voluntariness hearing testimony are part of the record.  Finally, the jury was properly instructed as follows:

> **You must not consider any statements made by the defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the defendant made the statement voluntarily.**
> **A defendant's statement was not voluntary if it resulted from the defendant's will being overcome by a law enforcement officer's use of any sort of violence, coercion, or threats or by any direct or implied promise, however slight.**
> **You must give such weight to the defendant's statement as you feel it deserves under all the circumstances.**

(Doc. 11, Exhibit RR at pp. 2-3) (emphasis in original).  The Arizona Court of Appeals denied a petition for review without comment.  (Doc. 11 at Exhibit TT).

Review of the record shows that petitioner's post-conviction counsel sought, but could not obtain, a record of the voluntariness hearing.  (Doc. 11, Exhibit LL and Exhibit MM at p. 21).  However, both parties agree that a voluntariness hearing was held prior to trial (May 29, 1998), and that a number of witnesses testified.  (Doc. 11, Exhibit MM at p. 21; Exhibit R at p. 2).  The trial court in denying Rule 32 relief noted, and petitioner has not contested, that all of the witnesses who testified at the

voluntariness hearing also testified at trial.  (Doc. 11, Exhibit RR at p. 2).

Appellate counsel did not obtain a copy of the transcript of the hearing to support the <u>Miranda</u> claim.  (<u>See</u> Doc. 11, Exhibit KK at p. 9)  It is not clear if he, like post-conviction counsel, tried but failed to obtain a transcript or simply did not attempt to obtain a transcript.

In his habeas petition, petitioner cites as involuntary only statements he made on May 1, 1997 (the day of the incident), during questioning by police officers at the hospital emergency room while awaiting treatment for his gunshot wound to the head and later that day after he came out of surgery.  (Doc. 1 at p. 11-1).  In particular, he cites questioning by Detectives Lawrence Baggs and Jeff Kendall, as well as Officer John Ferris as improper.[2]  (<u>See</u> <u>id.</u>).

Although petitioner does not recount the content of the questioning at the hospital in his habeas petition, the gist of the answers he gave, which were used against him at trial via the testimony of these officers, were his claims that both he and Wendy were shot by someone he did not know and that he had nothing to do with Wendy's being shot.  Later at trial, he completely changed this story and argued that he did shoot Wendy, but in self-defense.  He claimed he perpetuated the lie to police and others because he wanted to protect both himself and Wendy from getting into trouble.  (<u>See</u> Doc. 11, Exhibit N at p. 63).

---

[2]Petitioner was also questioned that day (after his surgery) by Detective Allen Reed.  (Doc. 11, Exhibit KK at p. 5).

Upon review of the record, even assuming appellate counsel rendered ineffective assistance by failing to submit a copy of the voluntariness hearing in support of the <u>Miranda</u> claim on direct appeal, this claim must fail because petitioner cannot show prejudice.  As noted by respondents in their answer, even if the statements petitioner made to police at the hospital (concerning either being shot by an intruder or failing to remember what happened to him), which petitioner admitted at trial were lies (he knew he shot Wendy and claimed self-defense), had been excluded, such statements were cumulative of similar statements made to police and other witnesses at other times.

For instance, petitioner told the 9-1-1 operator that an armed intruder shot him and Wendy.  (Doc. 11, Exhibit P at pp. 1-4).  He also told a police officer at the scene the same story.  (Doc. 11, Exhibit G at p. 27 (testimony of Officer Stephen Laird)) Later, on May 12, 1997, more than 10 days after the incident, petitioner agreed to an interview with Detective Baggs when he came to police headquarters on his own initiative to retrieve some property and reiterated the armed intruder/third party shooter story.  (Doc. 11, Exhibit F at pp. 63-65).  In fact, petitioner maintained this story, or that he simply did not recall what happened, to various individuals for nearly a year, up through April of 1998.  (Doc. 11, Exhibit N at pp. 57-58; Exhibit Z at pp. 91-95 and 98-107 (testimony of Debra Zentner and Donna Carpenter); Exhibit AA at pp. 8-25 (testimony of petitioner's mother that he told her he did not know how the shooting occurred).

As a result, even if petitioner had been successful in

barring admission at trial of any statements he made to police at the hospital on May 1, 1997, ample additional evidence of the false story (the armed intruder shooter) was available to the prosecution from a number of witnesses.  Petitioner admitted at trial that he lied about a third-party shooter to protect himself and, he claims, Wendy.  In light of this additional evidence, any statements made at the hospital were cumulative and, thus, their admission at trial was harmless. Based on other evidence and testimony, petitioner would still have had to admit during his testimony that his initial story (that someone, not him, shot Wendy) was a lie, especially to support his claim of self-defense.

For these reasons, counsel's failure to obtain a transcript of the voluntariness hearing was harmless and petitioner cannot show that but for this error he would have prevailed on appeal. The trial court's determination at the Rule 32 (upheld without comment on review) that petitioner was not prejudiced by any failure to produce a transcript is neither contrary to or an unreasonable determination of federal law as determined by the U.S. Supreme Court.  This claim should be denied.

**IT IS THEREFORE RECOMMENDED** that the Petition for Writ of Habeas Corpus be denied.

This Report and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal filed pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's order and judgment.  The parties shall have ten (10) days from the date of service of this Report and

Recommendation within which to file specific written objections with the Court.  Thereafter, the parties have ten (10) days within which to file a response to the objections.  Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's Report and Recommendation.

DATED this 8th day of May, 2006.

_Virginia A. Mathis_
Virginia A. Mathis
United States Magistrate Judge

41